[Cite as *State v. Grissom*, 2016-Ohio-961.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

    Plaintiff-Appellee

v.

KHRYSTOPHER GRISSOM

    Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:

C.A. CASE NO.   26626

T.C. NO. 12CR2996

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____11th____ day of _____March_____, 2016.

. . . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

KHRYSTOPHER GRISSOM, #685-116, London Correctional Institute, P. O. Box 69, London, Ohio 43140
    Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Khrystopher Grissom, pro se, appeals from a judgment of the Montgomery County Court of Common Pleas, which denied his motion for leave to file a motion for a new trial, pursuant to Crim.R. 33.   In a supplemental brief, Grissom also asserts as error

the trial court's denial of his motion to correct the record, pursuant to App.R. 9(E). For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} In October 2012, Grissom was indicted for felonious assault (deadly weapon) with a five-year firearm specification (Count One), discharge of a firearm on or near a prohibited premises (serious physical harm) with a three-year firearm specification (Count Two), and having weapons while under disability (Count Three). In a previous opinion, we described the underlying facts, as adduced at trial, as follows:

On September 29, 2012, at approximately 11:30 p.m., Daniel Sammons was walking out of a Speedway gas station store on North Dixie Drive in Harrison Township, Ohio, when the door he used to exit the store grazed Grissom's arm. Grissom, who had been standing outside and leaning his shoulder against the door, became angry after the door grazed him, and he began cussing at Sammons. In response, Sammons looked at Grissom and walked away. The confrontation between Sammons and Grissom at Speedway is not in dispute.

Sammons, however, testified that as he walked away, Grissom came toward him and said: "I'm a shoot you up." Additionally, Chris Watkins, a passenger sitting in Sammons's Jeep Liberty parked nearby, testified that he heard Grissom say "shoot you up" to Sammons in an escalated voice. Thereafter, both Watkins and Sammons saw Grissom run and jump inside a maroon Ford Expedition parked nearby. It is undisputed that Grissom was in the driver's seat of the Expedition and that Grissom followed

Sammons's Jeep out of Speedway and onto North Dixie Drive.

Sammons and Watkins testified that Grissom sped up very close to the rear of Sammons's Jeep and changed lanes so that the Expedition was on the Jeep's driver's side. Both men then heard a gunshot fire into the Jeep as they were driving. Neither Sammons nor Watkins saw a gun, but Watkins testified that he saw a flash and could tell that the gunshot came from the front-seat area of the Expedition. It is undisputed that there was a gunshot fired at the Jeep and that it came from somewhere inside the Expedition.

The gunshot shattered the rear window of Sammons's Jeep and hit the left side of the driver's seat. In response to the gunshot, Sammons testified that he slammed on the brakes and called 9-1-1. Additionally, both Sammons and Watkins testified that they followed the Expedition, which continued to drive away from them after the shot was fired. Sammons and Watkins also testified that they pulled over after spotting a State Trooper on the side of the road, and that they told the officer what had happened.

Londell Johnson, a passenger in the Expedition driven by Grissom, testified that the Expedition belonged to his sister, who is Grissom's girlfriend. Johnson testified that on the night of the shooting, his brother, Lewis, and Grissom's friend, Jaye, were also riding as passengers in the Expedition. According to Johnson, Jaye was seated in the front-passenger seat and he and Lewis were in the back.

Johnson also testified that when they went to Speedway, he,

Grissom, and Lewis got out of the Expedition, and that Grissom was the last person to return to the vehicle. While Johnson did not see Grissom's confrontation with Sammons, he testified that Grissom returned to the Expedition and said: "Dude just bumped me." When Johnson inquired who bumped him, Grissom pointed to Sammons's Jeep. Johnson testified that Grissom was the only person in the vehicle that got angry about the confrontation and that he and Lewis were trying to calm him down.

In addition, Johnson testified that he heard a gunshot while they were riding beside the Jeep and that he heard someone say: "Watch out, little bro." He further testified that the gunshot came from inside their vehicle, but that he did not see who fired the gun. After the gunshot, Johnson testified that Grissom drove away. At trial, Johnson's testimony regarding who fired the gun was impeached using a written statement that Johnson gave to police two days after the shooting. Johnson acknowledged that he wrote as part of his statement that, "Jimmy [a.k.a. Grissom] shot the gun." Johnson further acknowledged that he had indicated in his statement that Grissom told him to say that Jaye had fired the gun. Furthermore, Johnson testified that he and the other passengers had no reason to shoot Sammons.

(Citations omitted.) *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 3-9.

{¶ 3} Grissom was convicted, after a jury trial, of all charges. The trial court merged Counts One and Two and the firearm specifications for those counts. The court

sentenced Grissom to six years in prison for felonious assault (Count One) and 12 months for having weapons while under disability (Count Three), to be served consecutively. The court also imposed five years of incarceration for the firearm specification, to be served consecutively to and prior to the sentences for Counts One and Three. Grissom's aggregate sentence was 12 years in prison.

{¶ 4} Grissom appealed from his convictions. On March 7, 2014, we affirmed. *Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857. Grissom filed a notice of appeal in the Ohio Supreme Court, but the Court declined to accept jurisdiction of Grissom's appeal. *06/11/2014 Case Announcements*, 2014-Ohio-2487.

{¶ 5} On September 8, 2014, Grissom moved for a new trial, pursuant to Crim.R. 33, based on newly discovered evidence, prosecutorial misconduct, and misconduct by Johnson. Specifically, Grissom asserted that Johnson had lied at trial when he testified that (1) he had not been promised anything by the State in exchange for his testimony and (2) Grissom was the shooter. Grissom claimed that the prosecutor committed misconduct by failing to correct that testimony. Grissom's motion quoted portions of Johnson's direct examination and cross-examination, which allegedly demonstrated that false testimony and misconduct.

{¶ 6} In his motion, Grissom contended that the State threatened to prosecute Johnson and to have Johnson's sister's children sent to Children Services unless Johnson wrote in a pretrial statement and testified at trial that Grissom was the shooter. Grissom claimed that he was unavoidably prevented from discovering evidence of the false testimony within the time period set forth in Crim.R. 33.

{¶ 7} Grissom supported his motion with an affidavit from Johnson and his own

affidavit. Johnson's affidavit stated that he (Johnson) had been coerced by the State to provide a false written statement and testimony, and it indicated that Grissom's friend, Jaye, was actually the shooter. Grissom's affidavit stated that he learned after August 15, 2014, that Johnson had presented false testimony at trial and that he (Grissom) learned of the facts in Johnson's affidavit when he received the affidavit. Grissom stated in his affidavit that he did not know of these facts prior to trial, at trial, or within 120 days (the time limitation for a motion for a new trial based on newly discovered evidence).

{¶ 8} The State opposed Grissom's motion and attached affidavits of the lead detective and the primary prosecutor at trial, denying Johnson's allegations. The State argued that (1) Grissom had not demonstrated that he was unavoidably delayed from learning the new evidence upon which he relied, (2) the evidence was not new because Grissom had sufficient opportunity to discover this information before or during trial, and (3) Grissom cannot demonstrate that the alleged new evidence would have affected the outcome of the trial, because there was evidence that Grissom aided and abetted the shooting, even if he was not the actual shooter.

{¶ 9} Grissom filed a reply memorandum, in which he repeated his prior arguments and claimed that the State was taking advantage of an error that it had invited.

{¶ 10} On February 27, 2015, the trial court overruled Grissom's motion for leave to file a motion for a new trial. The court found that the excerpts of the trial transcript, as quoted by Grissom, showed that Johnson's allegations of coercion were not newly discovered but, instead, were raised during Grissom's trial. The court emphasized that the alleged newly discovered evidence was elicited on cross-examination by defense counsel, and "[i]t is clear from the [trial transcript] that Johnson never 'lied,' as Defendant

alleges by failing to admit this information to the jury. Indeed, Johnson and Defense counsel's exchange on cross-examination clearly demonstrates that the jury was made aware of all of Johnson's allegations."

**{¶ 11}** Grissom appealed from the trial court's ruling.

**{¶ 12}** While this appeal was pending, Grissom filed an affidavit and statement of the evidence, citing App.R. 26(C), seeking to reconstruct the record to show that Johnson answered "No" when asked on direct examination, (1) "You didn't have a choice coming here to testify?" and (2) "You're not getting breaks? No deals? No one promised you anything?" The transcript showed Johnson's answers to be "no audible response."

**{¶ 13}** On June 10, 2015, we construed Grissom's affidavit as a motion to correct the record, pursuant to App.R. 9(E), and we remanded the matter to the trial court for the limited purpose of considering the record issues raised by Grissom. We instructed Grissom to file a motion to correct the record in the trial court. Grissom did so on June 30, 2015. The trial court denied the motion on August 11, 2015, finding that "the trial transcript is substantially consistent with testimony received by the Court."

**{¶ 14}** In his appellate brief, filed prior to our June 10 remand to the trial court, Grissom raised one assignment of error, claiming that the trial court abused its discretion when it determined that Johnson's testimony was not newly discovered and denied his (Grissom's) motion for leave to file a motion for a new trial, pursuant to Crim.R. 33.

**{¶ 15}** On December 14, 2015, with leave of this court, Grissom filed a supplemental brief, raising an additional assignment of error that the trial court's denial of his motion to correct the record "violate[d] his right to due process and his right to a new trial." We will address Grissom's assignments of error together.

## II. Denial of Motions to Correct the Record
## and for Leave to File a Motion for a New Trial

{¶ 16} Crim.R. 33(A)(2) permits a defendant to file a motion for a new trial based on misconduct of the jury, the prosecuting attorney, or witnesses for the state. Crim.R. 33(A)(6) allows the trial court to grant a new trial "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at trial." A motion for new trial based on Crim.R. 33(A)(2) generally must be made within fourteen days after the verdict was rendered; a motion for a new trial based on newly discovered evidence generally must be brought within 120 days. Crim.R. 33(B).

{¶ 17} A defendant who seeks a new trial after the required time period must first obtain leave from the trial court, demonstrating "by clear and convincing proof that the defendant was unavoidably prevented" from filing his motion for a new trial or discovering the evidence upon which he relies. Crim.R. 33(B). "[A] party is unavoidably prevented from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 146, 483 N.E.2d 859 (10th Dist.1984); *State v. Wilson*, 2d Dist. Montgomery No. 23247, 2009-Ohio-7035, ¶ 8.

{¶ 18} A defendant is entitled to a hearing on his motion for leave if he submits "documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence" at issue. *State v. York*, 2d Dist. Greene No. 99-CA-54,

2000 WL 192433 (Feb. 18, 2000); *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 19 (2d Dist.).

**{¶ 19}** Although a defendant may file his motion for a new trial along with his request for leave to file such motion, the trial court may not consider the merits of the motion for a new trial until it makes a finding of unavoidable delay. *State v. Stevens*, 2d Dist. Montgomery Nos. 23236, 23315, 2010-Ohio-556, ¶ 11; *York, supra*.

**{¶ 20}** A trial court's decision on a Crim.R. 33 motion for a new trial will not be reversed absent an abuse of discretion. *State v. Metcalf*, 2d Dist. Montgomery No. 26101, 2015-Ohio-3507, ¶ 4. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 21}** We also review the trial court's denial of Grissom's motion to correct the record for an abuse of discretion. *State v. Morgan*, 8th Dist. Cuyahoga No. 78142, 2001 WL 470170, *2 (May 3, 2001).

**{¶ 22}** Johnson was the first witness on the second day of trial. (On the State's motion, and with agreement of defense counsel, Johnson was called as a court's witness, not as a State's witness. Tr. 123.) Johnson testified that he knew Grissom as "Jimmy," that Grissom was the boyfriend of one of Johnson's sisters, and that his sister was, at that time, pregnant with Grissom's child. Johnson testified that it was not his choice to testify at Grissom's trial, and that he was only testifying because he got a subpoena. (Tr. 235.)

**{¶ 23}** Johnson then testified about the events of September 29, 2012. With respect to the shooting, Johnson stated that he and his (Johnson's) brother were in the

back seat of his sister's Expedition; Grissom was driving, and Grissom's friend, Jaye, was in the front passenger seat (Tr. 238-39). Johnson testified, "The only thing I heard, you feeling me, was a gunshot. * * * I can't say who shot it. * * * I heard, 'Watch out.' " (Tr. 246.) Johnson agreed that the shot came from the car in which he was a passenger. *Id.*

{¶ 24} The prosecutor asked Johnson about a statement he wrote for the police two days after the shooting. Johnson acknowledged that he had told the police and had written that Grissom "went right behind him and that's when he told me to 'Move, little bro.'" (Tr. 248.) Johnson agreed that he had also said and had written that "Jimmy shot the gun." *Id.* Johnson testified that the only person that had a reason to shoot at the Jeep was Grissom (Tr. 252), but he also stated, "At the same time, how can you shoot at the same time? You got to keep your eyes on the road. Point blank period. The dude, Jaye, is the closest one to the window. You hear me?" (Tr. 252.) However, Johnson further testified that Grissom later apologized for the incident (Tr. 253). Johnson testified at trial that his brother told him not to say anything about the shooting (Tr. 254.), but Johnson acknowledged that his written statement indicated that Grissom had told him not to say anything. (Tr. 255.) The State continued its questioning regarding the written statement, as follows:

Q: That's what you wrote in your written statement, right?

A: You said it.

Q: No one forced you to write this statement?

A: At the same time, he told me, my man's took the blame. You feeling me?

Q: I'm asking you. No one forced you what to say in your written statement. And when you wrote this statement, didn't this man tell you, write honestly what happened? Tell us honestly what happened on September 29th?

A: Uh-huh.

Q: Didn't he tell you to say honestly what happened? Did he tell you to lie in your statement?

A: No. Why would he tell me to lie on my statement? You feeling me?

Q: He didn't tell you to lie on your statement. This is something you wrote on your own free will, right?

A: Right.

Q: No one told you exactly what to say here?

A: That's what I said.

Q: So on your statement, he said, oh, tell them Jaye did it, right? That's what you wrote, right? Khrys told you, tell them Jaye did it, right?

A: And that's what I wrote. You feeling me? N**ger didn't tell me to do it. That's what I wrote. You feeling me?

Q: He didn't tell you and no one told you, other than this detective here, tell us honestly what happened.

A: Right.

(Tr. 255-56.)

{¶ 25} The State asked Johnson again about his willingness to provide testimony at trial:

Q: You didn't have a choice coming here to testify today, right?

A: (No audible response.)

Q: That's a no, right?

A: Right.

Q: Okay. Are you getting anything for testifying today?

A: Yes, ma'am.

Q: You're not getting any breaks? No deals? No one promised you anything?

A: (No audible response.)

Tr. at 258.

{¶ 26} Afterward, the State again questioned Johnson again about the contents of his written statement.

{¶ 27} On cross-examination, Johnson stated that Detective Daugherty had met him at school, and that he (Johnson) was worried that the police would think that he was the shooter. (Tr. 265-66.) Defense counsel then questioned Johnson about his statement, asking:

Q: Okay. And were you told at any point in making that statement, if you didn't write that statement down, you might go down as the shooter?

A: It's a conspiracy. * * * At the same time when I first came there, you feeling me, they talking about taking my nephews and my sister, and all that. You feeling me? Pick – keep my nephew and my sister kids in children's services, if she don't write no statement, and she talking if we don't get Jimmy up here. You feeling me? Making threats and all that.

You feeling me?

Q: So the detective said if you didn't make that statement, he was going to take your sister's kids?

A: Right. That's what he was saying to my sister when I was in the room. You feeling me?

Q: Okay.

A: They was arguing. You feeling me? And I was arguing with them at the time. You feeling me? Then he came in here and said, Jimmy took the blame. All's I need you to do is write that down. You feeling me? That's what I did and he let me go.

Q: Okay. And you weren't charged with anything as a result of this; is that correct?

A: No. You feeling me?

Q: All right. Now, you said that – I guess when you wrote this statement, you said – when you said Jimmy shot – that was because you assumed he had?

A: Yeah.

Q: All right. You never actually saw a gun?

A: No, I ain't seen no gun. I just heard, "Watch out, little bro." You feeling me?

(Tr. 266-67.)

**{¶ 28}** Johnson further testified on cross-examination that he did not see anyone with a gun, and he did not know who told him to "watch out." (Tr. 269-70.) Johnson

denied that anyone had told him to lie at trial, and he asserted that he was telling the truth. (Tr. 273.)

{¶ 29} On redirect examination, the prosecutor asked Johnson about the top portion of his written statement, which states, "It's understood that the statements [are] made of my own free will" and Johnson had "not been placed under duress or made any promises in exchange for this." (Tr. 274.) Johnson responded that these disclaimers had not been read to him prior to his writing his statement.

{¶ 30} On recross examination, Johnson reiterated that no one read him the disclaimer at the top of the paper with his written statement, and Johnson said that he did not read it before writing his statement. (Tr. 278-79.) When asked if he felt pressured to write his statement, Johnson responded, "I just heard a lot of people getting into it with my sister. * * * Threatening my sister." (Tr. 279.) Johnson stated that he wanted to protect his sister.

{¶ 31} In his motion to correct the record, Grissom sought to have the transcript modified to reflect that Johnson had answered "No" to the two direct examination questions with no audible responses. With respect to the first question, the prosecutor made clear with a follow-up question that Johnson had intended "No" to the question about whether he had a choice to testify; this was consistent with Johnson's answer to the same question at the beginning of his direct examination. We find no abuse of discretion in the trial court's denial of Grissom's motion to correct the record as to the first question.

{¶ 32} The trial court found that the transcript was "substantially consistent" with Johnson's testimony, suggesting that the transcript accurately reflected that Johnson did

not audibly respond to the second question about "any breaks" he may have received. Even if the trial court had erred in reaching this conclusion and that Johnson's response was "No," we find the error was harmless, in light of Johnson's testimony on cross-examination.

{¶ 33} Grissom argues that the correction of the record is necessary, because it would establish that Johnson had lied when he said that he had received no benefit. However, Johnson informed the jury during his cross-examination that he was afraid that he would be accused of the shooting and that he heard police officers threatening his sister that her children (Johnson's nephews) would be taken by Children Services if she and Johnson did not write a statement. Johnson stated that he and his sister were arguing with the officers and that he was told that all he needed to do was write a statement saying that Grissom had committed the shooting. Johnson testified, "That's what I did and he let me go." Johnson's inaudible response has no bearing on whether Grissom is entitled to leave to file a motion for new trial.

{¶ 34} Upon review of Johnson's testimony, it is apparent that Grissom cannot establish that he was unavoidably prevented from discovering the alleged new evidence and bringing a timely motion for a new trial. Johnson's affidavit states that Detective Daugherty threatened to have Johnson's sister's children taken into the State's custody, and that Daughterty threatened to charge Johnson with the shooting if he did not cooperate. Johnson's written statement indicated that the detective instructed him (Johnson) to implicate Grissom in the shooting. The allegations against the detective in Johnson's affidavit, which Grissom claims are newly discovered, were brought out in defense counsel's cross-examination of Johnson at trial.

{¶ 35} Grissom was also not unavoidably prevented from discovering evidence that Johnson had "lied" when he identified Grissom as the shooter. Johnson testified at trial that he did not see who shot out of the vehicle; he did not expressly identify Grissom as the shooter. He confirmed that Grissom was the only person in the vehicle who had a gripe against Sammons, but Johnson further testified that Jaye was the individual closest to the window and that Grissom would have had a difficult time shooting and driving at the same time. Johnson also testified on cross-examination that he had identified Grissom as the shooter in his written statement, because he had assumed that Grissom was the shooter. Johnson's affidavit in support of Grissom's motion for a new trial identifies Jaye as the shooter, but defense counsel had an opportunity to explore Johnson's identification and any pressure he felt to identify Grissom at trial. Finally, we note that Grissom was in the vehicle when the shot was fired. Grissom did not need information from Johnson to know whether Johnson had incorrectly identified him as the shooter and for his attorney to cross-examine Johnson, as he did.

{¶ 36} Accordingly, Grissom did not establish that he had no knowledge of the existence of the ground supporting his motion for new trial (the information in Johnson's affidavit) and that he could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence. The trial court did not err in denying Grissom's motion for leave to file a motion for a new trial.

### III. Conclusion

{¶ 37} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, P.J. and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Khrystopher Grissom
Hon. Barbara P. Gorman