[Cite as *State v. Warren*, 2017-Ohio-853.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

STATE OF OHIO                  :

                  :

     Plaintiff-Appellee        :   C.A. CASE NO. 26979

                  :

v.                      :   T.C. NO. 94CR3533

                  :

RAYMOND WARREN        :   (Criminal appeal from

                  :    Common Pleas Court)

     Defendant-Appellant   :

                  :

. . . . . . . . . . .

**O P I N I O N**

Rendered on the _____10th_____ day of _____March_____, 2017.

. . . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

JOANNA FEIGENBAUM, Atty. Reg. No. 0087717, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the court on the January 11, 2016 Notice of Appeal of Raymond Karl Allen Warren. Warren appeals from the trial court's December 15, 2015 "Decision, Order and Entry Overruling Motion for Leave to File Motion for New Trial." On April 4, 1995, following a trial by jury, Warren was found guilty of murder with an accompanying firearm specification. He was sentenced to 15 years to life on the murder

charge and to an additional consecutive three years on the firearm specification.

{¶ 2} This Court affirmed Warren's conviction on appeal in *State v. Warren*, 2d Dist. Montgomery No. 15202, 1996 WL 612858 (Oct. 25, 1996), noting therein that the State's evidence at trial established the following:

Shortly after midnight on July 10, 1994, Wendell Scott Simpson was shot three times in his automobile on Kilmer Street in Dayton. Moments later, his automobile crashed into the porch of a house on Kilmer. Simpson died as a result of his gunshot wounds.

Police officers who responded to the scene of the crash received information from a resident of Kilmer Street that Simpson had been seen talking with three young black men on mopeds shortly before the shooting. Approximately an hour after police officers had arrived at the scene, Warren drove down Kilmer Street toward the accident on a moped. Because Warren matched the general description of the young men who were last seen talking with Simpson, Sergeant Larry Grossnickle stopped Warren and asked him if he would be willing to answer some questions. Warren agreed. After answering questions briefly at the scene, Warren was taken to the police station to make a statement.

At the police station, a police evidence technician administered an atomic absorption test ("AA test") on Warren's hands to detect the presence of antimony and barium. The presence of these two uncommon substances on one's hands indicates a high probability that the person has fired a gun, has handled a gun which was fired, or has been "down range"

of a weapon which was fired within the previous two to four hours. The police later learned that Warren's right palm had tested positive on the AA test for both substances.

Warren was also interviewed at the police station by Detective Doyle Burke. Warren told Burke that he and two of his friends, whom he identified only as "Tony" and "Chante," had been walking up Kilmer pushing a moped at around midnight on July 10. Warren stated that a green car had pulled up to them and that the driver had asked about purchasing drugs. "Tony" responded that they did not sell drugs, and the group proceeded up the street. According to Warren, the young men heard gunshots and a crash a few minutes later. Warren was released after making his statement.

Approximately one month after the shooting, police identified and located the two young men who had been with Warren on July 10. "Tony" was identified as Antonio Johnson, and "Chante" was identified as Chante Hunt. Johnson and Hunt each testified at trial that, as they walked up Kilmer Street with Warren on July 10, Warren stopped to talk with a man in a green car after the man called out to him. The two men testified that they had heard shots as they proceeded up the street without Warren, and that Warren had later admitted to them, individually, that he had shot the man in the car. According to Johnson, Warren shot Simpson because Simpson had tried to give him fake money for the second time. Johnson and Hunt also testified that they had each seen Warren with a gun the day before the shooting, and Johnson identified that weapon as a .380 automatic.

Andre Wright and Stanley Williams were the first people to stop at the accident scene the night of July 10. Wright and Williams had been driving in a gold or brown car. Wright testified that they had seen Simpson's car "running" on the porch of a house as they drove down Kilmer Street, and that Simpson had been hanging out the window waving his arm. Wright and Williams turned their car around after they had passed the house, parked, and approached the car. By this time, Wright testified that Simpson was no longer moving. Wright reached into the car and put it in park. When the engine continued to race, Wright approached the car again and turned off the engine. Like Warren, Wright and Williams were interviewed extensively by police officers the night of the shooting.

The police recovered three spent shell casings in and around Simpson's car. A ballistics expert determined that the shell casings were from .380 caliber bullets and that all three had been fired from the same gun. On the seat of the car, police also found a bundle of fake three-dollar bills wrapped in a couple of real dollar bills.

The defense presented two witnesses, Patricia and John Moreland, who lived in the neighborhood where the shooting occurred and knew Warren prior to the shooting. Patricia Moreland testified that she had heard two gunshots as she returned to her house from a friend's house around midnight on July 10. She testified that she had seen Warren on Randolph Street around the time the shots were fired and that she had seen the green car "speeding" on Kilmer, Lakeview and Adelite Streets. Mrs. Moreland

further testified that she had heard the shots, but had not seen Simpson get shot, and that there was no one in the vicinity of Simpson's car when the shots were fired. Mrs. Moreland did not see anyone else on Kilmer Street. Mrs. Moreland stated that she ran into her house when the shots were fired and did not see or hear the car crash.

John Moreland stated that his wife had returned home around 11:00 or 11:30 on July 9, and that she was at home when they heard a loud crash outside. He also testified that he had seen two men drive by the accident in a brown car, turn around, and park across the street from the house into which the car had crashed. He testified that he had watched these men approach the green car several times and reach inside. He said that the men had not appeared to be helping the driver, that it looked as if they had been searching for something, and that they had reached down by the driver's feet.

*Warren*, *1-2.

{¶ 3} On January 9, 2002, Warren filed a pro se "Motion to Receive Copy of Trial Transcripts," attached to which is Warren's December 29, 2001 affidavit which provides, in part, that he "respectfully moves this Honorable court to provide for him a copy of his trial transcripts in that the defendant is moving for a new trial having obtained newly discovered evidence." Warren's supporting affidavit provides in part: "I have received a signed affidavit from one of the states [sic] key witnesses stating that he lied at trial and that [sic] I am presently preparing a motion for a new trial." Warren asserted that the "transcripts requested are vital to my preparation for a new trial," and that the "[s]igned

affidavit and statement of the states [sic] witness is hereby attached to this motion as exhibit (A)." Attached to Warren's affidavit is what appears to be the affidavit of Chante Hunt, dated October 26, 1999. It provides as follows:

I give this statement of my own free will. I was ask by Allan [sic throughout] (Raymond Warren) attorney to give a true account of what happen [sic] in the summer of 1994 when Allan was charged with the murder of that man that ran into the house on S. Kilmer. I gave testimony in court, but that testimony was false. I lied because I was told that if I didn't say that Allan shot that man that I would be charged with the murder of the man. I was scared of what could be done to me. Hell they had Allan down there for something he nothing [sic] to do with, and I didn't want to be in his shoes. I tried to not come to court, but the police came and arrested me and made me come. So now I'm glad that I have a chance to set this wrong right.

On the night the man was killed Me [sic] and Antonio went to Allan [sic] house to get his scooter. We were taking it to Antonio's house to fix a flat tire. When we got there I went in to get something to drink. Allan got the Scooter, and gave me a pop and some chips and we left his house headed for Antonio's. When we reached half way up the block a car pulled up, and ask us if we had some dope. Allan said we don't mess with that s***. Antonio cursed them out and we kept going after they pulled off. When we reached about half way between Kilmer and Dennison on Lakeview. [sic] We heard some shots and we All [sic] took off running

towards Antonio's house. When we got there we set on the porch for a minute to make sure some [sic] wasn't shooting at us. After awhile [sic] we started fixing Allan's scooter. Once we got done fixing the scooter I went to the corner of S. Kilmer and Lakeview to check out what looked like a fire. Allan went to the gas station to gate [sic] some gas. I think Antonio went in the house. When I got to the fire there was a car ran into a house [sic].

That's what happen [sic]. Allan didn't kill anyone, and I know because he was with me and Antonio when we did here [sic] shots.

**{¶ 4}** The State opposed the motion, and the court overruled Warren's motion on January 23, 2002, noting that Warren "has already unsuccessfully appealed his conviction and sentence."

**{¶ 5}** On November 19, 2013, Warren filed a pro se "Motion for a hearing on Criminal Rule 33 A-2 Newly discovered evidence." Therein he asserted in part that at his trial, "Antonio Johnson and Chante Hunt lied on the witness stand due to fear from threats made by detectives to be charged with the murder if they did not state that Raymond K. A. Warren" murdered Simpson. Attached to the motion is the "Affidavit of Antonio Johnson," dated August 18, 2008, which provides as follows:

1. I was a witness for the prosecution in the 1994 criminal trial of Raymond Karl Allen Warren.

2. I wish to recant my testimony regarding the whereabouts of Raymond Warren. When we heard the gunshots, Raymond was walking with me, pushing a broken moped to my house. At trial, I testified that Raymond was not with me. This testimony was false. The police told me

if I didn't testify against Raymond, I could be charged with a crime. I was young and scared of what they could do to me.

3. I also wish to recant my testimony regarding statements made by Raymond Warren. Raymond never confessed committing this murder to me. At trial, I testified that Raymond confessed committing this murder to me. This testimony was also false, for the same reason outlined in paragraph 2.

4. The truth is, on the night of the murder, Raymond, Chante Hunt and I were pushing a moped from Raymond's house to my house. When we heard the gunshots, all three of us ran to my house. Raymond could not have shot this person, because Raymond was with Chante and me when we heard the gunshots.

{¶ 6} Also attached is the August 13, 2008 "Affidavit of Antonio 'Johnson' Robinson" (hereinafter, "Antonio"), which provides as follows:

1) That I am the person named above and that I am at least 18 years of age and of sound body and mind.

2) That I testified at a Probable Cause hearing in Montgomery County Juvenile Court in connection with a criminal case, No. 94-5770 on behalf of the District Attorney.

3) At the time that I gave testimony I was a minor child 14 years of age.

4) That after I testified at the Probable Cause hearing, I testified at the criminal trial of Raymond K. Warren in the Montgomery County

Common Pleas Court in Case No. 94-CR-3533.

5) On or about July 20, 1994, I was questioned by a Detective Burke who threatened to charge me with the death of Windell [sic] Scott Simpson.

6) On or about August 11, 1994, I was arrested in my backyard by two detectives who took me to the Safety Building in downtown without notifying my parents who were home at the time.

7) I was placed in a room where I was once again questioned and threatened with being charged with Mr. Simpson's death by Detective Engle and his partner.

8) The detectives offered to release me if I agreed to place blame for Mr. Simpson's death on Raymond K. Warren.

9) I agreed to their offer out of fear of being charged with Mr. Simpson's death and because I was told I could not go home unless I agreed to do so.

10) At the time, I was given a statement that was prepared by one of the detectives and told to read it aloud while they video taped [sic] me doing so.

11) The statement I read was not written or prepared by myself and was totally fabricated by the detectives then present.

12) On or about October 4, 1994, I testified at the Probable Cause hearing and gave the same false testimony that I had been provided by the detectives on August 11, 1994.

13)  On or about March 13, 1995, I testified against Raymond K. Warren at a trial in Montgomery County Common Pleas Court where I recited false testimony provided to me by the detectives.

14)  The aforementioned testimony, as well as the testimony I gave at the Probable Cause hearing was false and was given out of fear that the detectives would make good on their threats to charge me in connection with the death of Windell [sic] Scott Simpson.

15)  The following testimony is a true account of the events that took place on or about July 9th of 1994.

16)  On or about July 9, 1994, Raymond Warren asked me to help fix a flat tire on his motor scooter.

17)  Myself, Chante Hunt, and Raymond Warren agreed to bring the scooter to my house at 804 Dennison Avenue to be repaired.

18)  I rode my own scooter from my home to Raymond Warren's home on South Kilmer Avenue while Chante Hunt and Raymond Warren followed on foot in order that we might retrieve Raymond Warren's scooter.

19)  The three of us arrived at Raymond Warren's house where I waited on the front porch while Chante Hunt and Raymond Warren went inside the home to retrieve the scooter.

20)  Upon retrieval of the scooter, the three of us proceeded to walk down South Kilmer in the direction of Lakeview Avenue in order to return to my house on Dennison Avenue.

21)  During this time I pushed my scooter while the rear wheel flat

tire on Raymond Warren's scooter required that both he and Chante Hunt lift up the rear of Raymond Warren's scooter as they pushed it.

22) At some point while we were walking down South Kilmer, a car pulled alongside [sic] us headed in the opposite direction and the driver inquired if any of us had any drugs.

23) I responded by swearing at the driver and calling them dope fiends, while Raymond Warren responded by telling the occupant(s) that we did not mess with that stuff.

24) The car pulled away, traveling down South Kilmer in the opposite direction as were travelling.

25) We continued towards Lakeview Avenue on foot pushing the scooters.

26) When we reached Lakeview Avenue and between Dennison Avenue and South Kilmer Avenue in which we stood in reference to being on Lakeview, we heard what sounded like gunfire.

27) The three of us began to run to my house at the corner of Dennison and Lakeview Avenues.

28) We arrived at my home with our scooters in a matter of seconds after we heard the sounds of gunfire.

29) Once we realized that no one appeared to be shooting at us, we began repairing the flat tire on Raymond Warren's scooter.

30) Myself and Raymond Warren worked on the scooter while Chante Hunt talked with my brother and father at the picnic bench on the

front lawn of my house where we were working or repairing the flat tire.

31) After we finished repairing the flat tire, I retired inside of my house.

32) Raymond Warren informed me that he was going to the gas station on the corner of Germantown and Dennison in order to get gas before returning home.

33) At no time during that or any other day have I witnessed Raymond Warren possessing a gun or shooting anyone.

34) Further affiant sayeth naught.

Finally, the October 26, 1999 affidavit of Chante Hunt is attached to Warren's motion.

{¶ 7} The State opposed the motion on January 21, 2014. On January 30, 2014, the trial court issued a "Decision, Order and Entry Overruling Motion for Leave to File Motion for New Trial," construing Warren's motion "as seeking leave to file a motion for new trial." The court concluded "that Defendant has failed to meet his burden of proving by clear and convincing evidence that he was unavoidably prevented from discovering the evidence upon which he relies in support of his Motion for New Trial." The court found that the "eighteen year delay between Warren's conviction and his motion, and the fourteen year delay after obtaining Hunter's [sic] affidavit, and the five year delay after obtaining Johnson Robinson's is not a reasonable period to delay the filing of said motion." Warren appealed the trial court's decision, and this Court reversed and remanded the matter, concluding that "the trial court erred when it overruled his motion for leave to file a motion for new trial before allowing Warren his allotted time to file a reply memorandum. See *State v. York,* 2d Dist. Greene No. 99-CA-54, 2000 WL 192433

(Feb. 18, 2000)." *State v. Warren*, 2d Dist. Montgomery No. 26112, 2015-Ohio-36, ¶ 15.

{¶ 8} On March 3, 2014, counsel from the Ohio Public Defender's Office filed, on Warren's behalf, a "Motion for Appointment of the Office of the Ohio Public Defender as Counsel." The motion provides in part that "[e]ffective counsel is required in collateral proceedings to both investigate and litigate constitutional claims based on evidence outside the record." The motion provides in part as follows:

Although the Ohio Innocence Project (OIP) obtained the Robinson Affidavits approximately five years ago, the OIP never filed a pleading on Mr. Warren's behalf and are now precluded from representing Mr. Warren based on the assertion of their ineffectiveness in the post-conviction review process. Mr. Warren, as attested by the accompanying Affidavit of Indigency, is unable to retain counsel and thus requests the services of counsel. The Office of the Ohio Public Defender has reviewed Mr. Warren's motion for a new trial, and finds it to be meritorious. Accordingly, this Court should appoint the Ohio Public Defender as counsel.

{¶ 9} On January 12, 2015, the trial court issued a "Notice to File Reply Memorandum," which provides: "Consistent with the Decision of the Second District Court of Appeals rendered on January 9, 2015, Defendant, Raymond Warren, is hereby given notice that he shall file any reply memorandum to the State's Memorandum in Opposition to his Motion for Leave within ten days of the Date of this Notice. The court shall deem Defendant's Motion for Leave to File Motion for New Trial to be ripe on January 24, 2015." On January 13, 2015, counsel for Warren from the Office of the Ohio Public Defender sought a 30-day extension to reply, and on January 16, 2015, the court

overruled in part and sustained in part the motion for an extension. The court concluded as follows: "Defendant shall have fourteen days from the date of this Order to file any reply memorandum. The court finds any request for a thirty day extension of time to be unreasonable, as counsel represented Defendant in his recent direct appeal * * *."

{¶ 10} On January 29, 2015, Warren filed "Defendant Raymond Warren's Motion for Leave to Amend and Supplement his Motion for Leave to File a Motion for New Trial." Attached to the motion is Hunt's above affidavit. Also attached is the Affidavit of Marcia Dukes, dated January 15, 2015, which provides that she worked on Warren's case in her capacity as a criminal investigator in the Office of the Ohio Public Defender, and that she interviewed Hunt on March 18, 2004. Dukes averred that in the course of the interview, "Chante Hunt affirmed his 1999 affidavit and stated that he lied during Raymond Warren's trial because he was scared of the police." Dukes further averred that she "never located or spoke to Antonio Johnson." She attached her "write-up of my interview of Chante Hunt" to her affidavit.

{¶ 11} Also attached is the January 21, 2015 "Affidavit of Antonio Robinson," which provides:

1. My name is Antonio Robinson. I used to go by the name Antonio Johnson.

2. I testified in Raymond Karl Allen Warren's trial. I know him as Allen.

3. My testimony during Allen's trial was a lie. He was with me at the time we heard shots, and he never confessed to me that he killed Mr. Simpson. He could not have been the shooter.

4.    After Allen's trial, I did not come forward and tell the truth because I was scared.   I feared I would be charged with perjury.

5.    Before 2004, I did not know that Allen or anyone in his family was looking for me.   In 2004, I saw Allen's brother, who I knew as Doughboy, and realized that I should tell the truth and clear my conscience.   I admitted to Doughboy that I lied during Allen's trial.   I am not sure if I wrote a statement down, or if I just told Doughboy I lied.

6.    Doughboy died in 2007.   From December 2004 to November 2007, I was incarcerated.   During that time, I did not know that Allen's family was looking for me.

7.    In 2008, after I got out of the penitentiary, I signed two statements.   The contents of those affidavits are accurate and true.

8.    On December 31, 2013, two men who said they worked for the Montgomery County Prosecutor's Office interviewed me about Allen's case. I have read the affidavit that Gary Ware wrote after my interview.   His affidavit is a true and accurate account of what I told the investigators.

9.    I am still scared of being charged with perjury today.   However, I know that coming forward and telling the truth is the right thing to do because Allen did not kill that man and I want everyone to understand that Allen is innocent.

{¶ 12} Also attached is the August 13, 2008 "Affidavit of Antonio 'Johnson' Robinson," and the August 18, 2008 "Affidavit of Antonio Johnson," as set forth above. Warren attached the January 14, 2014 affidavit of Gary Ware, which provides that he has

been employed by the Montgomery County Prosecutor's Office as an investigator since 1982. Ware averred that he and Tom Shaw interviewed Antonio at his residence on December 31, 2013. According to Ware, Antonio advised him that "he recalled signing a document on August 13, 2008 and another document on August 18, 2008 in which he recanted his testimony from his 1994 statements in Case # 1994-CR-3533. He examined the signatures on both documents and stated he had signed them but he had not read them." Ware averred that when he asked Antonio why he signed the documents, Antonio told him that Warren's "mother approached him as he was leaving for work and told him she needed him to sign them for her son as she was trying to get him home." Ware averred that Antonio told him no one else was present when he signed the documents and that "he had no idea how the notary seal and signature of a Notary Public appeared on the documents." According to Ware, Antonio "stated that he did lie on the witness stand and that Raymond Warren was not the shooter. He stated he was intimidated by the police because he was just a kid at the time." Finally, Ware averred that Antonio advised him that "he has not seen Raymond Warren since 1994 and he has not spoken to or corresponded with him in any manner. * * * He further advised he has not seen Chante Hunt for several years."

{¶ 13} Warren asserted that since his trial, "new scientific evidence has emerged which undermines the gunshot residue evidence that was presented at [his] trial," and he attached a copy of the following: Wright, et al., *Summary of the FBI Laboratory's Gunshot Residue Symposium, May 31-June 3, 2005*, Forensic Science Communications (July 2006) Vol. 8, No. 3. The article contains the following conclusion:

At the conclusion of the symposium, several topics remained open

for further discussion: namely the use of time limits in case-acceptance criteria and how to standardize the language used to report the presence of GSR particles. Topics such as these are often dictated by individual laboratory policies, as well as the circumstances of a particular case. Therefore, it is unlikely that universal guidelines and terminology will evolve for the GSR community in these areas.

Some important topics were not discussed because of time limitations, specifically airborne particles and elemental contributions from different ammunitions. However, the limitations of GSR examinations were unanimously recognized, such that the use of qualifying statements in report writing and testimony was discussed in detail. It is expected that the language of qualifiers will continue to develop in order to provide juries with a sound basis to evaluate the conclusions reached through GSR analyses. Research is also continuing in the area of retention and contamination or transfer. It is hoped that these studies will be more readily available to the GSR community in the future through the use of internet list serves and forums such as this one.

{¶ 14} Warren also attached a copy of Chante Hunt's October 8, 1998 Judgment Entry of Conviction for possession of cocaine, which reflects that Hunt received a mandatory three-year sentence. Also attached to the motion is the affidavit of Larry Vancant II, which provides that he is employed by the Office of the Ohio Public Defender, and that he has served as the "Investigator for the Ohio Public Defender's Wrongful Conviction Project" since December of 2012. Vancant averred that in the course of his

employment he was asked to locate Hunt, and that from "July 14, 2014, through the present, I have attempted to locate Chante Hunt. During that time, I have made over a dozen trips to either Dayton or Cincinnati to find Chante. I have visited addresses listed for Chante, his family, and his associates." Vancant asserted that his "attempts to find and speak to Chante Hunt have been unsuccessful."

{¶ 15} Warren attached "Offender Information Details" for Antonio from the Ohio Department of Rehabilitation and Correction showing that Antonio was incarcerated in 2004-2007. He also attached the January 26, 2015 affidavit of Mary Miller, which provides that she is Warren's mother, and that her "two sons, Eric and Alexander, hired Dayton Attorney Jay Carter to represent [Warren] in challenging his conviction." According to Miller's affidavit, Carter "located * * * Hunt and obtained an affidavit from him in 1999. In the affidavit, Chante admitted that he lied in [Warren's] trial and that [Warren] was innocent." Miller averred that once her sons could no longer afford to pay Carter, he "stopped working on [Warren's] case and never filed anything for him." Miller averred that over "the years, my family and I have tried to find Antonio. My son Alexander spoke to him in 2004, but Antonio did not write a statement." Miller stated that she found Antonio in 2008, and that at that time he "signed two affidavits admitting that he lied in [Warren's] trial and that [Warren] is innocent."

{¶ 16} Warren attached the January 21, 2015 affidavit of Robert L. Lane, which provides that he was employed by the Ohio Office of the Public Defender from 1981 to 2011. Lane averred that Warren "initially wrote to the Office of the Ohio Public Defender, seeking assistance, on May 11, 2003. Intake Attorney John Fenlon responded to that letter and the case was then assigned to me." Lane attached Fenlon's May 30, 2003

letter as well as copies of correspondence between him and Warren from 2003-2004. Lane stated that Warren in his initial letter "included the 1999 affidavit of witness Chante Hunt. In his initial letter and in subsequent letters, Mr. Warren proclaimed his innocence." Lane stated that his office located Hunt when he was incarcerated, and that he directed Dukes to interview him in the Montgomery County Jail, at which time Hunt "affirmed his 1999 recantation." Lane stated that he was unable to find Antonio. Lane averred as follows:

* * *

13. On May 12, 2004, I sent a letter to Mr. Warren informing him that his case with the Office of the Ohio Public Defender would be closed. I explained to Mr. Warren that a new trial motion based only on Mr. Hunt's affidavit, without a recantation from Antonio Johnson and in light of the gunshot residue tests that were administered to Mr. Warren's hands, would likely be unsuccessful.

14. My opinion was based on my years of experience working on criminal appeals and post-conviction litigation. I stand behind my opinion; based on my experience, I believe that it was necessary for Mr. Warren to obtain the recantations of both Mr. Hunt and Mr. Johnson for him to have a chance of success in a motion for new trial.

15. I informed Mr. Warren that his chances for success may change if Antonio Johnson were to come forward and recant, and that he should write to me if he heard from Antonio Johnson.

{¶ 17} Fenlon's May 30, 2003 letter to Warren provides in part: "A second issue

arises. Chante Hunt's affidavit was signed three years ago. A court may find the delay in utilizing the affidavit grounds alone to dismiss a motion for new trial. * * *." The letter further provides: "Thus, while the rule provides for motions based upon new evidence, you must demonstrate grounds for delay. Hunt's affidavit is three years old. Please explain the delay in seeking a new trial given you have had the Hunt affidavit for three years. The State will be sure to ask." Finally, the letter provides: "Also, you indicate that Antonio Johnson has also recanted. If so, has he prepared an affidavit? The court of appeals decision affirming your conviction states that Johnson's testimony corroborated Hunt's. Thus, either testimony would by itself defeat any motion for new trial."

{¶ 18} Warren attached the December 1, 2014 Affidavit of Attorney Jennifer Paschen Bergeron, which provides that she is an Assistant Academic Advisor and Staff Attorney at the Ohio Innocence Project in Cincinnati ("OIP"), which "is a non-profit organization that operates through the University of Cincinnati College of Law." Bergeron averred that "[e]ach spring students apply for positions as OIP fellows" to assist OIP attorneys. According to Bergeron, in "2008, [Warren] wrote to the OIP requesting that OIP review his case. During the investigation of Mr. Warren's case, the OIP received two affidavits from Antonio Johnson * * *." Bergeron averred that "Johnson's affidavits are quite similar to an affidavit provided to Mr. Warren in 1999 by Chante Hunt." She averred that based upon "the recantations by the State's key witnesses and Mr. Warren's adamant protestation of innocence throughout this case, Mr. Warren's case is the type of case that OIP might agree to accept and pursue in court." Bergeron averred that "after receiving [Antonio's] affidavits and without apparent authorization, in September 2009, the Fellows

working Mr. Warren's case closed and improperly filed the case file." Bergeron further averred that Warren's "case file was rediscovered in November 2010, and Mr. Warren's case file was reopened in January 2011. Once the file was reopened, OIP began investigating the potential invalidated science claim surrounding the gunshot residue evidence used against Mr. Warren at his trial." Bergeron averred as follows:

6. During the process of working on Mr. Warren's case again, the OIP became aware of an incident in 2012, unrelated to this case, in which Mr. Warren was involved. Based on that incident - not the evidence in his murder case – the OIP determined that it was not able to represent Mr. Warren in court. The OIP communicated with Mr. Warren regarding this reason. Around the same time, a private attorney who had previously worked as an assistant prosecutor, Kim Haliburton Murphy, contacted the OIP expressing an interest in working on an OIP case. With Mr. Warren's permission, the OIP asked Ms. Murphy if she would be interested in taking over Mr. Warren's case. Ms. Murphy agreed to consider the case. The Fellows working on the case as well as myself communicated with Ms. Murphy numerous times, including an in-person meeting at our office in Cincinnati, to share documents and discuss the case. It is my understanding that Ms. Murphy and Mr. Warren eventually entered into a formalized attorney-client relationship wherein Ms. Murphy agreed to assist Mr. Warren's effort to obtain post-conviction relief. OIP closed Mr. Warren's case in 2013.

7. In February 2014, Mr. Warren contacted OIP again. At that

time, Mr. Warren informed OIP that out of frustration [he] had filed a pro se motion for new trial. He inquired whether OIP could assist him with the current appeal. At that time, OIP reached out to the Ohio Public Defender's Office to see if they could assist Mr. Warren with this appeal.

{¶ 19} Warren also attached the January 15, 2015 affidavit of Joseph Bodenhamer, who averred that he is employed by the Office of the Ohio Public Defender and serves as the Director of the Office of the Ohio Public Defender's Wrongful Conviction Project. According to Bodenhamer, on "March 21, 2013, our office received the Wrongful Conviction Project Questionnaire, which serves as an application for assistance," from Warren. He averred that Warren advised that he was represented by the OIP, and that he later learned that Warren was represented by Murphy. Since Warren was represented by counsel, Bodenhamer averred that his case with the Wrongful Conviction Project was closed on April 9, 2013. He attached a copy of the "close letter" to his affidavit.

{¶ 20} Warren attached a copy of correspondence from Murphy, dated February 13, 2014, which provides in part as follows:

As we discussed when we met last spring, my knowledge of criminal law and post-conviction relief is practically non-existent, and I was very hopeful that Rick Ketcham would be able to assist me more than his health has allowed. I know that you are frustrated with the length of the process in your case, and I feel that you should be in the hands of counsel who not only have the time but the specialized knowledge to be of assistance to you.

Accordingly, neither Rick nor I will be your counsel in this matter.

{¶ 21} Finally, Warren attached the January 18, 2015 Affidavit of Attorney Richard Scott Ketcham to his motion, which provides in part:

* * *

4.  My ex-wife is attorney Kim Halliburton Murphy.

5.  In the spring of 2013, Kim Halliburton Murphy asked that I accompany her to visit a new client of hers, Raymond Warren, in the correctional institution in which he was housed. Kim wanted to know my thoughts on Mr. Warren's case.

6.  It was never my understanding that I would be co-counsel on Mr. Warren's case or that I would be assisting Kim Halliburton Murphy in any way beyond that initial visit.

7.  After the initial visit with Mr. Warren, Kim Halliburton Murphy never mentioned his case to me again.

{¶ 22} On January 29, 2015, "Defendant Raymond Warren's Reply to the State of Ohio's Memorandum in Opposition to Defendant's Motion for Leave to File a Motion for New Trial" was filed. On February 27, 2015, the "State's Response to Warren's Reply to the State's Memorandum in Opposition to Warren's Motion for Leave to File a Motion for New Trial and Warren's Motion for Leave to Amend and Supplement his Motion for Leave to File a Motion for New Trial" was filed. Finally, on March 5, 2015 Warren replied to the State's response. On May 18, 2015, the trial court sustained Warren's motion to amend. On May 20, 2015 "Defendant Raymond Warren's Amended and Supplemented Motion for Leave to file a Motion for New Trial" was filed with all of the above exhibits attached.

{¶ 23} Warren asserted that since his trial, he "has discovered new evidence that undermines his conviction and proves his actual innocence," in reliance upon the recantation of Hunt and Johnson. He further argued that new scientific evidence undermines the gunshot residue test applied to him. Warren asserted that he was unavoidably prevented from discovering the evidence, and that he was entitled to a hearing. Regarding the recantations, Warren asserted that although he "knew that Chante and Antonio testified falsely at trial, he had no reason to know they would recant until they came forward. Nothing on the face of the affidavits leads to the conclusion that Mr. Warren could have obtained the recantations sooner." He asserted that his "incarceration, coupled with his lack of an attorney or investigator, inhibited him from finding the new evidence quickly." Warren argued that experienced "attorneys and investigators have had difficulty finding [Hunt]; thus it is reasonable that Mr. Warren, who was incarcerated and lacked resources, could not find [Hunt] on his own prior to 1999." Regarding Antonio, Warren asserted that he was "incarcerated from 2004-2007 and thus inaccessible, and he started going by the last name 'Robinson' rather than 'Johnson,' making it difficult to locate him. * * * He was released from prison in November 2007, and shortly thereafter, Mr. Warren's mother located him and obtained his recantation." Finally, Warren asserted that the "studies and scientific developments related to GSR did not take place until after his conviction. * * * Until the FBI Symposium in 2005 and subsequent report in 2006, the scientific community had not reached a consensus on the issues related to GSR and they were not widely publicized."

{¶ 24} Warren further asserted that after "discovering the new exonerating evidence, Mr. Warren made diligent efforts to present it to this Court." Warren asserted

that "the State suffered no burden," and that he "had no incentive to 'bide his time' and delay presenting the new evidence; he claims actual innocence and his only hope of relief is to present his new evidence." Warren asserted that his "delay is due to early advice he received from counsel, limitations encountered as a pro se litigant, and failure of counsel." Warren asserted as follows:

Since his conviction, Mr. Warren has relied on the assistance of attorneys. He understandably believed that it was better to have attorneys litigate his case rather than attempt to do so on his own, with limited legal knowledge and resources. It was reasonable for him to rely on the advice of Attorney Lane and to seek Antonio's recantation before filing a motion for new trial. And once he obtained the recantation, he relied on the OIP and Attorney Murphy to effectively represent him. The OIP and Attorney Murphy failed him. Since his conviction in 1995, Mr. Warren had diligently challenged his conviction by investigating his case, filing pro se motions, and seeking and relying on the assistance of counsel.

**{¶ 25}** Warren asserted that the State recently disclosed new evidence pursuant to its *Brady* obligations. Warren asserted that investigators for the State interviewed Antonio on December 31, 2013, and Warren argued as follows:

* * * Antonio's recent statement to the State's investigators shows that (1) Antonio is reliable; (2) Antonio's recantation has remained consistent for nearly six years; (3) Antonio testified falsely in Mr. Warren's trial; (4) Antonio knows that Mr. Warren was not the shooter; (5) Antonio has not communicated with Mr. Warren since 1994; (6) Antonio is willing to

recant to representatives of the State, despite the State's authority to bring perjury charges against him. * * *

Further, a recantation made to a law-enforcement officer, or similarly situated individual, is more reliable than a statement made to a defendant's family member. * * *

* * *

* * * In light of the material differences between Antonio's 2008 affidavits and his statement to State investigators, Investigator Ware's affidavit constitutes evidence that must be disclosed pursuant to *Brady.* The State met its *Brady* obligations by disclosing the affidavit on January 21, 2014.

Warren asserted that based upon the State's disclosure, "this Court should hold a hearing to determine whether Mr. Warren is entitled to a new trial."

{¶ 26} Finally, Warren asserted that he "has presented new evidence that undermines all of the evidence presented against him in his trial." Citing his exhibits as well as testimony at his trial, Warren asserted as follows:

Antonio and Chante's recantations are reliable. When they gave statements to police and testified in Mr. Warren's trial, Chante and Antonio were young boys who were questioned under stressful and intimidating circumstances. * * * Then age 14, Antonio was unexpectedly approached by multiple police officers in two police cars. * * * He was taken from his yard, without being able to tell his parents, and was told he could go home only after he gave a statement. Similarly, Chante was approached

unexpectedly early one morning. * * * Both Chante and Antonio were told that if they did not implicate Mr. Warren, they would be charged with murder. Scared, Antonio made a statement. * * * Chante signed a statement written by police.

During his trial, it was evident that neither boy wanted to testify against Mr. Warren.  On the day they were to testify, despite being subpoenaed, neither boy appeared.  * * * The next day, police picked up both boys and held them at the police department prior to testifying. Antonio then testified that he told the police what they wanted to hear.  * * *  In his testimony, Chante could not recall significant details, including that he had allegedly seen Mr. Warren with a gun the day before the shooting and that Mr. Warren confessed to him, until his recollection was refreshed with the statement written by the police.

As adults, Antonio and Chante have recanted.  They have no motivation to do so other than to clear their consciences. * * * They do not have contact with Mr. Warren, and thus he has not pressured them to recant. * * * And both men have recanted despite the negative consequences – perjury charges – which may befall them.  Significantly, Antonio's and Chante's recantations are consistent with one another. * * *

Aside from the testimony of Antonio and Chante and the GSR "evidence," there was no other evidence - direct or circumstantial – against Mr. Warren that the State presented at his trial.  There was, however, evidence that implicated at least two other suspects.   Immediately after

Mr. Simpson was shot, at least two men, with no reason to be in the neighborhood, parked their car across from Mr. Simpson's, approached his car, and reached inside. * * * A witness actually observed *three* men exit the car, but one disappeared before the police arrived. * * * Their car had fresh damage, and when police searched Simpson's car, his keys and wallet were missing, supporting the conclusion that the men took them. * * * The two remaining men were taken to the police station but were not fingerprinted or tested for GSR. * * *

In light of Antonio's and Chante's recantations, the invalidated GSR evidence presented at his trial, and evidence implicating other suspects, Mr. Warren is entitled to relief.

{¶ 27} On July 7, 2015, the "State's Motion Contra Warren's Amended and Supplemented Motion for Leave to File a Motion for New Trial" was filed. On July 13, 2015, "Defendant Raymond Warren's Reply to the State's Motion Contra Warren's Amended and Supplemental Motion for Leave to File a Motion for New Trial" was filed.

{¶ 28} In its Decision overruling Warren's motion for leave to file motion for new trial, the trial court noted that the motion is premised upon Antonio's affidavits, dated August 18 and 13, 2008, as well as "what would appear to be an affidavit of Chante Hunt dated October 6, 1999." The court noted that there "is no affidavit of Defendant Warren included with the Motion nor filed contemporaneously with the Motion, or any amendments thereto," but the court noted the affidavit filed by Warren on January 9, 2002, attached to his Motion to Receive Copy of Trial Transcripts. The court noted that Warren's affidavit was dated December 29, 2001. The court further noted that attached

to "Warren's Motion dated January 9, 2002 was the affidavit of Chante Hunt dated October 26, 1999 * * *. The record also reveals that Defendant was represented by an attorney, Kenneth J. Rexford, associated with a motion that he filed on October 28, 2009."[1]

{¶ 29} The court reviewed the trial testimony of Gary Shaffer, a forensic chemist at the Miami Valley Regional Crime Laboratory regarding the analysis of gunshot residue found on Warren's hand, and it noted that "Shaffer was subjected to vigorous cross-examination by Warren's trial counsel. Particularly, Shaffer admitted to defense counsel that he could not determine if Warren had actually fired a weapon. Shaffer also admitted that people can come into contact with antimony and barium sufficient to have an effect on the testing." The court noted that defense counsel "also elicited from Shaffer testimony that a variety of substances, including grease and lubricating oils contain barium and fireworks may be a source of antimony."

{¶ 30} The court reviewed Antonio's and Chante's testimony at trial, and reviewed the affidavits of Dukes, Miller, Lane, and Bergeron. The court noted that a "private attorney, Kim Murphy, expressed an interest in working on Warren's case, although she did not follow through with her representation."

{¶ 31} The court noted as follows:

Warren claims that new scientific evidence undermining the gunshot residue test warrants leave to file a motion for a new trial. He claims that environmental contamination from police sources can taint the results of a

---

[1] The record reflects that Rexford filed a "Motion of the Defense to Correct Status of Void Sentencing Entry," and on December 18, 2009 the trial court issued a nunc pro tunc entry reflecting that Warren was found guilty as a result of a trial by jury.

gunshot residue test. To suggest that Warren has new evidence that he was unavoidably prevented from obtaining regarding AA testing belies the evidence and cross-examination of his counsel at trial. At trial, Defendant's counsel cross-examined evidence technician, Steven Tobias, Crime Lab Analyst, Tim Duerr, and forensic chemist, Gary Shaffer, about the gunshot residue or AA test procedure and results, as well as concerns about gunshot residue. The witnesses testified that barium and antimony can be found in nature and described the various sources of the particles in nature. It is clear from the trial transcript that Defendant's trial counsel was aware of concerns associated with AA testing in 1994 and attempted to undermine the credibility of the evidence presented at trial. The trial testimony also made clear that the elements sought in the AA testing occurred in nature, and could have been present in the materials associated with Warren working on the minibike he was fixing at or near the time of Simpson's death.

Based on the foregoing, the court finds that Defendant has failed to present clear and convincing evidence that he was unavoidably prevented from discovering the evidence upon which he relies in support of his Motion for Leave to File Motion for New Trial. Warren has failed to prove that Johnson and Hunt's testimony, and the evidence relating to AA testing could not, in the exercise of reasonable diligence, have been discovered within the statutory time period for filing a motion for a new trial. While Warren claims that he was unaware of the information associated with Hunt and Johnson's recantations, and AA testing, he has failed to address why he

was unavoidably prevented from discovering that information in the exercise of due diligence.

Even assuming Defendant was unavoidably prevented from discovering the evidence upon which he relies, his motion was not filed within a reasonable period of time after the discovery of the evidence. Warren argues that he lacked an attorney, resources, or an investigator, and has limited education, coupled with his incarceration, thereby supporting his claim that he was unavoidably discovering [sic] the evidence he has presented in support of his claim. Warren's arguments do not serve to excuse the untimely filing of the motion. Nothing in Crim. R. 33 supports Warren's conclusion. While Warren believed that he needed counsel to adequately present his motion for leave to file for new trial, he appeared to have no difficulty filing other motions on his own. Warren's lack of counsel does not excuse his delay in filing his Motion for Leave. In addition, the record does not support Warren's claims. Repeatedly since the time of his conviction, an attorney has either entered an appearance herein and filed a motion on behalf of Warren [sic]. Furthermore, the affidavits supplied by Warren demonstrate that he has repeatedly had counsel at his disposal, either through the State Public Defender's Office or the Ohio Innocence Project, since at least 1999 when Warren was represented by Attorney Jay Carter. Defendant attempts to conflate the issues with superfluous concerns, none of which address the crux of the matter – whether there is newly discovered evidence, and whether Warren was unavoidably

prevented from discovering that evidence, and filing his motion in a timely manner.

Warren failed to present the court with the newly discovered evidence within a reasonable period of time. Contrary to Warren's assertions, his incarceration, lack of resources, and the alleged unavailability of the recanting witnesses did not prevent him from discovering the new evidence sooner. Warren has known about all of the affidavits since as early as 1999 and as late as 2008. He was capable of contacting attorneys, filing other motions, and was even advised by the State Public Defender's Office to file the Motion for Leave on his own, yet Warren chose to sit on Hunt's affidavit for 14 years and Johnson's affidavits for approximately 5 years, prior to filing his Motion for Leave. Crim.R. 33 does not contemplate a Defendant filing a Motion for Leave or Motion for New Trial only when the evidence is in a perfect state. Instead, Crim.R. 33 provides a threshold for the filing of a motion for new trial or motion for leave *when the evidence is discovered*, and then contemplates a period for additional evidence to be obtained prior to hearing. Warren could not sit on the new evidence in the hope that witnesses would no longer be available or no longer recall the events clearly, or that evidence might disappear or no longer be available. * * *

Furthermore, the other affidavits supplied by Warren, particularly those of his mother and attorneys who have assisted him since his conviction, are not newly discovered evidence that support his Motion for

Leave, but instead represent efforts to explain why Warren did not file his Motion prior to late 2013. The court finds that, under the circumstances, the excuses for Warren's delay in the filing of his Motion for Leave are not adequate. The affidavits, while they tell a story of Warren's efforts, do not excuse the staggering delay between obtaining the evidence that could support a motion for new trial, and the filing of his Motion for Leave.

The court finds that Warren has failed to demonstrate that he filed his Motion for Leave within a reasonable time under the circumstances and that he has not adequately explained the reason for his delay. Warren has known about all of the substantive evidence upon which he relies since, at the latest, 2008, and at the earliest 1999. Warren has offered no reasonable explanation for the delay in the filing of his Motion.

The court further finds that since Warren failed to show that he was unavoidably prevented from timely filing his Motion, he is not entitled to an evidentiary hearing on that Motion.

{¶ 32} Because we find it to be dispositive in the instant case, we will first address Warren's second assignment of error as follows:

{¶ 33} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO HOLD A HEARING ON WARREN'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL WHEN THE RECORD AND CIRCUMSTANCES SUPPORTED WARREN'S CLAIM THAT HE WAS UNAVOIDABLY PREVENTED FROM DISCOVERING THE EVIDENCE AT ISSUE, AND THE DELAY IN FILING THE MATERIAL WAS REASONABLE UNDER THE CIRCUMSTANCES."

{¶ 34} In his second assignment, Warren contends that the trial court abused its discretion when it failed to hold a hearing in order to determine whether he was unavoidably prevented from timely discovering the evidence in support of his motion for leave to file a motion for new trial, and whether the delay in filing said evidence was reasonable under the circumstances. Specifically, Warren asserts that he "has submitted evidence which, on its face, demonstrates that he was unavoidably prevented from discovering the new evidence which supports his motion."

{¶ 35} Regarding a hearing on his motion, Warren asserts that this "Court's precedent is clear: Where a defendant submits documents which on their face support his claim that he was unavoidably prevented from timely discovering the evidence, the trial court must hold a hearing on his motion for leave to file a motion for new trial." Warren argues that the "evidence established that it was not until 1999 and 2004, respectively, when Hunt and [Antonio] finally admitted they lied. * * * After 2005, [Antonio] could not be found again and did not execute an affidavit until 2008." He asserts that he "submitted additional evidence which demonstrates, on its face, his diligent efforts and the difficulty he encountered locating Hunt and [Antonio] due to lack of resources, the witness' incarceration and [Antonio's] name change. * * * An affidavit from a State investigator further established that [Antonio] had not communicated with Warren since 1994." Finally, Warren argues that the Report of the FBI Symposium "establishes that it was not until several years after Warren's conviction when the new scientific evidence became available," and "the report was not published until 2006." Warren argues that "the studies cited in the report regarding appropriate testing methodology and GSR particle categorization, morphology, false positives from environmental sources, and

contamination largely did not occur until years after Warren's conviction."

{¶ 36} The State responds that "Warren filed his motion for new trial based upon newly discovered evidence twelve years after he had knowledge of Hunt's recantation and five years after he had knowledge of Antonio's recantation." The State asserts that Hunt and Antonio were subjected to rigorous cross-examination, leading "to the conclusion that Warren questioned their veracity and impetus for testifying against him at trial." The State argues that to "suggest that Warren has new evidence that he was unavoidably prevented from obtaining regarding atomic absorption testing belies that evidence and cross-examination of his trial counsel." The State directs our attention to the defense counsel's cross-examination of Officer Tobias, Duerr, and Shaffer, and the State argues that a "review of the cross-examination reveals that Warren's trial counsel was aware of concerns associated with atomic absorption testing in 1994 and attempted to undermine the credibility of the evidence presented at trial." According to the State, the "trial testimony made clear that the elements sought in the atomic absorption testing occurred in nature, and could have been present in the materials associated with Warren working on the scooter he was working on near the time of the shooting."

{¶ 37} The State asserts that Warren's delay in filing his motion was not reasonable under the circumstances, and that while "Warren believed that he needed counsel to adequately present his motion for leave to file a motion for new trial, a review of the docket reveals that he had no difficulty filing motions on his own. Warren's lack of counsel does not excuse his delay in filing his motion for leave to file a motion for new trial." The State asserts as follows:

* * * Furthermore, the affidavits supplied by Warren in support of his

motion for leave demonstrate that he has repeatedly had counsel at his disposal, through Attorney Jay Carter, the State Public Defender's Office or the [OIP]. Additionally, in a letter dated May 12, 2004, Lane, an Assistant State Public Defender, advised Warren, "If you wish to file a motion for new trial, or any other legal action, you will have to do so on your own behalf, or obtain other counsel."

{¶ 38} Crim.R. 33 provides:

(A) A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

* * *

(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.

(B) * * *

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered * * *. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶ 39} As this Court this previously noted:

"In order to be able to file a motion for a new trial based on newly

discovered evidence, beyond the one hundred and twenty days prescribed in the above rule, a petitioner must first file a motion for leave, showing by 'clear and convincing proof that he has been unavoidably prevented from filing a motion in a timely fashion.' " *State v. Morgan*, 3d Dist. Shelby App. No. 17-05-26, 2006-Ohio-145. "[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden* (1984), 19 Ohio App.3d 141, 145-146, 19 OBR 230, 483 N.E.2d 859.

*State v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, ¶ 16 (2d Dist.). "Crim.R. 33 motion are post-trial motions. Therefore, they are governed by Crim.R. 47, which provides that the motion 'shall state with particularity the grounds upon which it is made . . .' " *York*, 2000 WL 192433, *3 (Grady, J. dissenting).

{¶ 40} " 'Clear and convincing proof' is that 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, citing *Cross v. Ledford* (1954), 161 Ohio St. 469, paragraph three of the syllabus." *State v. McConnell*, 2d Dist. Montgomery No. 24315, 2011-Ohio-5555, ¶ 14. As this Court further noted in *McConnell*, ¶ 15:

"A trial court must first determine if a defendant has met his burden of establishing by clear and convincing proof that he was unavoidably prevented from filing his motion for a new trial within the statutory limits. If that burden has been met but there has been an undue delay in filing the

motion after the evidence was discovered, the trial court must determine if that delay was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." *State v. Stansberry* (Oct. 9, 1997), Cuyahoga App. No. 71004 [1997 WL 626063]. See, also, *State v. Kimbrough*, Cuyahoga App. No. 84863, 2005–Ohio–1320, at ¶ 17; *State v. Newell*, Cuyahoga App. No. 84525, 2004–Ohio–6917; *State v. Valentine*, Portage App. No.2002–P–0052, 2003–Ohio–2838, at ¶ 9; *State v. York* (April 6, 2001), Greene App. No. 2000 CA 70 [2001 WL 332019].

**{¶ 41}** As this Court has further noted:

* * * If the defendant submits documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence, the trial court must hold a hearing to determine whether there was unavoidable delay. *State v. Wright* (1990), 67 Ohio App.3d 827, 828, 588 N.E.2d 930 [(2d Dist.)]. In the hearing, the court must determine if there is clear and convincing proof of unavoidable delay.

*State v. York*, 2d Dist. Greene No. 99-CA-54, 2000 WL 192433, *2 (Feb. 18, 2000).

**{¶ 42}** "If it is not found that the defendant was unavoidably prevented from discovering the new evidence or from filing his motion for a new trial, the trial court is precluded from considering the untimely motion. *State v. Wilson,* 2d Dist. Montgomery No. 17515, 1999 WL 173551, *1 (Mar. 31, 1999)." *State v. Warren,* 2d Dist. Montgomery No. 26112, 2015-Ohio-36, ¶ 13.

**{¶ 43}** As this Court noted in *McConnell,* ¶ 18:

The essence of Crim.R. 33 is that collateral attacks on the validity of

trial proceedings must be made close in time to the proceeding to ensure that any issue raised may be given full and fair consideration. The rule equally protects both the finality of verdicts and principles of judicial economy. Delays in presenting evidence once discovered undermine the []overall objective of the criminal rules in providing the ["]speedy and sure administration of justice, simplicity in procedure, and the elimination of unjustifiable [* * *] delay." [*State v. Barnes*, 12th Dist. Clermont No. CA99-06-057, 1999 WL 1271665, *2 (Dec. 30, 1999).] Allowing a defendant to drag the process out while the evidence and the recollections of witnesses become increasingly stale defies the very purpose of the criminal rules. Similarly, once leave has been given, the promised evidence must be presented or the opportunity lost. Any other result would defeat the purpose of the rule intended to ensure that cases are decided on the best evidence available and that any defect in judgment is swiftly identified and swiftly remedied.

**{¶ 44}** "The trial court's determination of a Crim.R.33 motion is reviewed under an abuse-of-discretion standard. * * *." *McConnell*, ¶ 16. " ' "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.' (Citations omitted.) *State v. Mitchell*, 2014-Ohio-5070, 21 N.E.3d 1124, ¶ 13 (2d Dist.)." *State v. Lam*, 2015-Ohio-4293, 46 N.E.3d 138, ¶ 72 (2d Dist.).

**{¶ 45}** Since Warren filed his motion several years after the verdict was rendered

in his case, he was required to demonstrate that he was unavoidably prevented from timely discovering the evidence upon which he relies. In other words, he must demonstrate that he had no knowledge of the evidence and could not have learned of its existence within the statutory time period.

{¶ 46} In our view, the instant appeal does not involve the denial of a motion for a new trial, or even whether he should have been granted a hearing on his motion for a new trial. Rather, it asks only whether he should have been granted a hearing to attempt to convince the trial court that he was (1) "unavoidably prevented" from filing his motion for a new trial within 120 days of his conviction and (2) if so, whether his motion was filed within a "reasonable period of time" after discovery of the alleged new evidence. That is, the issue here is whether he should have had a hearing on his request to be permitted to file leave to file a motion for a new trial.

{¶ 47} The following represents a general chronology of Warren's attempts to have a determination of whether he should be permitted to file a motion for a new trial:

| | |
|---|---|
| Oct 25, 1996 | Conviction affirmed on direct appeal. |
| 1999 | Warren's mother hires a private attorney (Carter). |
| Oct 26, 1999 | Hunt provides an affidavit to Warren's attorney, recanting his trial testimony; Warren's attorney does not file a motion for a new trial. |
| Jan 9, 2002 | Warren files a *pro se* motion for trial transcript and includes an Oct 26, 1999 affidavit of Hunt recanting his trial testimony. |
| Jan 23, 2002 | Motion denied because of his previous direct appeal. |

| | |
|---|---|
| May 11, 2003 | Warren writes to the Ohio Public Defender (including Hunt's affidavit) seeking assistance; intake Attorney Fenlon responds and the case is assigned to Ohio Public Defender Attorney Lane. Subsequently, Lane's investigator locates Hunt in jail, who affirms his recantation. Lane is unable to find Johnson. |
| May 12, 2004 | Ohio Public Defender sends a letter to Warren closing his case, because no affidavit from Johnson. The letter advises Warren to find new attorney or file *pro se*. |
| 2004 | Johnson acknowledges false testimony to Warren's brother. Johnson becomes incarcerated under the name Robinson and Warren's brother dies. |
| July 2006 | Report from 2005 FBI symposium concludes that existing GSR testing procedures are flawed. |
| Nov 2007 | Johnson/Robinson is released from prison and recants to Warren's mother. |
| Aug 13, 2008 | Johnson/Robinson signs an affidavit, recanting his testimony at the juvenile court probable cause hearing and describing his interrogations by the police |
| Aug 18, 2008 | Johnson/Robinson signs an affidavit, which recants his trial testimony. |
| 2008 | Warren contacts the Ohio Innocence Project (OIP). |
| Sept 2009 | OIP case is closed by two Fellows (students) without |

| | |
|---|---|
| | authorization. |
| Oct 28, 2009 | Private attorney Rexford moves "to correct status of void sentencing entry." |
| Dec 14, 2009 | Trial court renders a decision stating that it shall issue a nunc pro tunc entry to "cure the defect in the prior sentencing entry, which failed to set forth that defendant was found guilty as a result of a jury trial." |
| Dec 18, 2009 | Trial court files Termination Entry (nunc pro tunc Apr 4, 1995) stating that defendant had been found "guilty by a jury * * *." |
| Jan 2011 | OIP discovers and reopens file. |
| 2012 | OIP decides not to represent Warren because of an unrelated conflict and transfers case to private attorney Murphy, who meets with Warren. |
| Mar 21, 2013 | Ohio Public Defender receives "wrongful conviction questionnaire" from Warren which "serves as an application for assistance." |
| Apr 9, 2013 | Wrongful Conviction Project (OPD) closes case, because Warren is represented by other counsel. |
| Nov 19, 2013 | Warren files a *pro se* motion for hearing with newly discovered evidence including Hunt's 1999 affidavit and Johnson's Aug 13 and 18, 2008 affidavits. |
| Dec 31, 2013 | Johnson interviewed by prosecutor's investigator and |

reaffirms recantation affidavit.

| | |
|---|---|
| Jan 30, 2014 | Motion for hearing with newly discovered evidence (of Nov 19, 2013) denied because Warren was not "unavoidably prevented" from discovering recantations. |
| Feb 13, 2014 | Attorney Murphy writes Warren saying she will no longer represent him, because she does not have the "specialized knowledge" to be of assistance. |
| Feb 2014 | Warren writes OIP saying he has filed *pro se* "out of frustration"; OIP "reaches out" to the Ohio Public Defender. |
| Mar 3, 2014 | Ohio Public Defender moves for appointment as counsel for Warren; states OIP had Johnson/Robinson affidavits for 5 years, but never filed motion and that OIP is now precluded from representing Warren because of the "assertion of their ineffectiveness in the post-conviction review process." |
| Jan 9, 2015 | Court of Appeals reverses trial court's Jan 30, 2014 ruling because Warren did not have opportunity to respond. |
| Jan 29, 2015 | Ohio Public Defender files a motion for leave to file together with affidavits of Johnson/Robinson (from 2008 and 2015), Hunt (from 1999), and prosecutor's |

investigator (from 2014).

Dec 15, 2015          Trial court denies, without a hearing, the Jan 30, 2014

motion for leave to file motion for new trial.

{¶ 48} A trial court has three options when a defendant files a motion for leave to file a motion for new trial. *See State v. Trimble,* 2015-Ohio-942, 30 N.E.3d 222, ¶ 16 (11th Dist.). First, if the trial court determines the documents submitted clearly and convincingly demonstrate the movant was unavoidably prevented from discovering the evidence, the court must grant the motion for leave and allow the motion for new trial to be filed. *See* Crim.R. 33(B). Second, if the trial court determines the submitted documents appear to "support [the movant's] claim that he was unavoidably prevented from timely discovering the evidence, the trial court must hold a hearing to determine whether there * * * is clear and convincing proof of unavoidable delay." *State v. York,* 2d Dist. Greene No. 99–CA–54, 2000 WL 192433, *2 (Feb. 18, 2000), citing *State v. Wright,* 67 Ohio App.3d 827, 828, 588 N.E.2d 930 (2d Dist.1990). Finally, if it determines the documents in support of the motion, on their face, demonstrate that the movant was unavoidably prevented from discovering the evidence, it is within the trial court's discretion to either sustain the motion or hold an evidentiary hearing. *See State v. McConnell,* 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 19 (2d Dist.).

{¶ 49} The Eleventh District Court of Appeals has held that a trial court abuses its discretion when it fails to, at the very least, grant a hearing to a defendant who waited five years after receiving recantation affidavits before filing his motion for leave to file a motion for new trial. *State v. Bentley*, 2016-Ohio-3290, 66 N.E.3d 180, ¶ 13 (11th Dist.). "[T]he trial court abused its discretion by not finding that appellant was unavoidably prevented

from timely discovering the new evidence or, at the very least, by not holding a hearing on the issue. *See* [*State v.*] *Alexander,* [11th Dist. Trumbull No. 2011–T–0120, 2012-Ohio-4468], at ¶ 21 (further recognizing that 'requiring a hearing * * * whenever an appellant produces a recanting affidavit after 120 days places additional burdens on the trial courts, * * * [but] is necessary so that a genuine recantation that could be outcome determinative is not foreclosed only because the recanting witness decides to "do the right thing" belatedly')." *Id.*

{¶ 50} Additionally, "Crim.R.33 does not set forth any specific time strictures as to when a motion for new trial may be filed after unavoidable prevention has been found. However, 'case law has adopted a reasonableness standard.' " *Bentley*, ¶ 15, quoting *State v. Griffith,* 11th Dist. Trumbull No. 2005–T–0038, 2006-Ohio-2935, 2006 WL 1585435, ¶ 15. "As a result, a trial court may require a party to file his Crim.R. 33 motion within a reasonable time after he discovers the evidence." *Id.* The trial court must determine whether any undue delay "was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." *Id.* This determination is also reviewed for an abuse of discretion. *Id.* An abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler,* 2d Dist. Clark No. 09–CA–54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary 11 (8th Ed.2004).

{¶ 51} A defendant is, therefore, entitled to a hearing on his motion for leave to file if he "submits documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence" at issue. *State v. York*, 2d Dist. Greene No. 99-CA-54, 2000 WL 192433, *2 (Feb. 18, 2000); *State v. Grissom*, 2d Dist.

Montgomery No. 26626, 2016-Ohio-961, ¶ 17; *State v. Lenoir*, 2d Dist. Montgomery No. 26846, 2016-Ohio-4981, ¶ 16. Here, we find that Warren has done just that.

{¶ 52} The record establishes that Warren did not begin receiving pieces of his newly discovered evidence which serve as the basis for his motion for leave until 1999. However, the evidence Warren received was *just one* recantation affidavit from only one of the State's witnesses. We note that in its decision denying Warren's motion for leave, the trial court misstated the record when it made the following finding: "Warren has known about *all* of the substantive evidence upon which he relies since, at the latest 2008, *and at the earliest 1999.*" The record belies the finding made by the trial court.

{¶ 53} Unquestionably, this is a complex and convoluted paper record. There is a legitimate argument that Warren has followed the rules and marshalled the evidence he claims would warrant a hearing on his motion for leave to file a motion for a new trial, and that he has reasonably attempted to obtain the assistance of private and public attorneys in seeking to present that evidence to the court.

{¶ 54} In light of the foregoing, we find that the documents attached to his motion for leave, on their face, support a conclusion that he was unavoidably prevented from discovering the evidence within the time provided by the statute. Therefore, we conclude that the trial court abused its discretion when it denied Warren's motion for leave to file a motion for new trial without first conducting a hearing in order to determine whether he was unavoidably prevented from timely discovering the new evidence, and, once the evidence was obtained, whether he filed his motion within a reasonable time.

{¶ 55} Warren's second assignment of error is sustained.

{¶ 56} Warren's first assignment of error is as follows:

{¶ 57} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO GRANT WARREN'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL WHEN THE RECORD DEMONSTRATED BY CLEAR AND CONVINCING PROOF THAT WARREN WAS UNAVOIDABLY PREVENTED FROM DISCOVERING THE NEW EVIDENCE AND PRESENTED IT TO THE COURT WITHIN A REASONABLE TIME FOLLOWING ITS DISCOVERY."

{¶ 58} In light of our disposition with respect to Warren's second assignment of error, his first assignment is rendered moot.

{¶ 59} Having sustained Warren's second assignment of error, the judgment of the trial court is reversed, and this matter is remanded for a hearing to determine whether Warren was unavoidably prevented from timely discovering the new evidence, and, once the evidence was obtained, whether he filed his motion within a reasonable time.

. . . . . . . . . .

FROELICH, J., concurs.

WELBAUM, J., dissenting:

{¶ 60} I very respectfully dissent. As the trial court correctly determined, Warren failed to meet this burden, and he further failed to establish that his delay was reasonable under the circumstances. Since the documents attached to his motion do not on their face support a conclusion that Warren was unavoidably prevented from discovering the evidence within the time period provided by the statute, he is not entitled to a hearing on the motion. In my opinion the trial court did not abuse its discretion and I would overrule both assignments of error.

{¶ 61} Warren was found guilty of murder on April 4, 1995. As the trial court

noted, at trial counsel for Warren thoroughly questioned the truthfulness of Antonio and Hunt on cross-examination, and both witnesses' testimony arguably suggests, in part, that they implicated Warren out of fear and coercion. Antonio was 15 years old at the time of trial, and the following exchange occurred on cross-examination regarding Antonio's interaction with the police in the course of the investigation of the shooting:

Q. And a couple detectives came up to you in the back yard, is that right?

A. Yes.

Q. Was it four detectives?

A. Yeah.

Q. Did they have one car or two cars?

A. Two.

Q. Did they walk you out of your yard to one of those police cars?

A. Yes.

* * *

Q. And put you in the back seat?

A. Yeah.

Q. Did one of the officers then sit next to you in the back seat?

A. Yeah.

Q. Did you have a chance before getting into that cruiser * * * to go in and let your mom or dad know where you were going?

A. No, I tried to run.

Q. You tried to run from them. * * * So they grabbed you?

A.   Yeah.

Q.   And they brought you downtown?

A.   Yeah.

Q.   They took you to a room to talk to you?

A.   Yes.

* * *

Q.   They were telling you that it was about a murder, isn't that right?

A.   Yes.

Q.   And that they thought you might be involved somehow, is that what they thought?

A.   Yes.

Q.   And that's what they said to you?

A.   Yes.

Q.   They told you that they might have to put it on you?

A.   No.

Q.   No, they didn't say that?

A.   No.

Q.   But they told you they wanted to question you?

A.   Yes.

Q.   And they wanted to question you about Allen?

A.   They just, they really want to know who done it.

Q.   Did you not want to talk while you were downtown?

A.   I didn't want to talk to them, no, I didn't.

Q.   But you did talk?

A.   Yes.

Q.   Was that after they told you that *if you didn't talk they would hold you down there?*

A.   Yes.

Q.   That was after they told you that, right?

A.   Um hmmm.

Q.   You didn't want to stay down there, did you?

A.   No.

Q.   You didn't want to go to jail?

A.   No.

Q.   You were kind of scared of going to jail?

A.   Yeah.

Q.   You didn't want that?

A.   Yes.

Q.   Okay.   *So you told them what they wanted to hear, correct?*

A.   *Yes.*

**{¶ 62}**   On recross-examination, Antonio testified as follows:

Q.   You also stated on redirect that when the police talked to you they treated you well, is that right?

A.   Yes.

Q.   But didn't Detective Burke tell you that they had information that you were involved?

A.   Yes.

Q. * * * And was he treating you well when he said that to you?

A.   He said it so many times.

* * *

Q.   Was Detective Burke treating you well when he said that if you didn't tell, that unless you put this on Allen, unless you identified Allen, they would see about putting it on you.

MR. SLAVENS:   Objection, Your Honor.

THE WITNESS:   No.

THE COURT:   Overruled.

BY MR. DEWAR:

Q.   You don't remember that, sir?

A.    He didn't say that.

* * *

Q.   You took an oath in that transcript when you testified in Juvenile Court, didn't you?

A.   Yes.

Q.   You swore to God?

A.   Yes.

Q.   To tell the truth?

A.   Yes.

Q.   Whole truth?

A.   Yes.

Q.   Nothing but the truth?

A.   Yes.

* * *

Q.   * * *Did Detective Burke tell you that unless you put this on Allen, unless you identified Allen, that they would see about putting it on you?

A.   They did not say that.

Q.   Didn't say that?

A.   No.

Q.   Do you remember being asked that question in Juvenile Court under oath?

A.   I don't remember.

Q.   Okay.   Do you have page 37 there?

A.   No.

Q.   Turn to page 37, please.

* * *

Q.   Read this correctly, question, "Didn't he tell you that unless you put this on Allen or unless you identified Allen, that they would see about putting it on you?"   And at the top of the page 38 your answer was, "Yes," isn't that right?   I read that correctly?

A.   Yes, but I don't remember all this, man.

Q.   You don't remember all this?

A.   No.

**{¶ 63}** Similarly, Hunt testified as follows on cross-examination about his

interaction with the police in the course of the investigation:

    Q.  Do you remember what time it was that you were brought down to the police station?

    A.  It was about, early in the morning.

    Q.  Do you know if it was 6:30 a.m.?

    A.  It was something like that.

    Q.  You were asleep, weren't you?

    A.  Yes.

* * *

    Q.  You didn't know the police were coming, did you?

    A.  No.

* * *

    Q.  And there were two uniformed officers that showed up outside your door, weren't they?

    A.  Yes.

    Q.  Then your mother woke you up?

    A.  Yes.

    Q.  And within in a few minutes you were in a police car downtown, correct?

    A.  Yes.

    Q.  And you were taken to a room?

    A.  Yes.

* * *

Q.   And was there, there was no one in the room when you walked into the room, right?

A.   Right.

Q.   They left you in the room?

A.   Yes.

Q.   You were in the room for some time by yourself?

A.   Right.

* * *

Q.   And after you were in that room by yourself, then some detectives came in the room, didn't they?

A.   Yes.

Q.   And they told you that they were going to talk to you about a murder, didn't they?

A.   Yes.

Q.   They told you that maybe they were going, they were interested in your involvement in it?

A.   Yes.

Q.   So, this is less than an hour after you wake up in the morning and *you're being questioned about a possible murder that they're talking about putting on you, right*?

A.   *Right.*

Q.   You hadn't had breakfast yet?

A.   No.

Q.  Hadn't had anything to eat?

A.  No.

Q.  Hadn't had anything to drink?

A.  No.

Q.  What time did you get to bed the night before?

A.  About 3:00.

{¶ 64}  The record reflects that Warren was acquainted with Antonio and Hunt prior to trial.   Antonio testified that the police officers told him that they would continue to hold him if he refused to talk to them, and that he was scared of going to jail.   He testified that he told the officers what they wanted to hear, and his testimony suggests that he previously testified in juvenile court that he felt coerced into implicating Warren to avoid being charged himself.   Similarly, Hunt testified that he was questioned under intimidating circumstances and that officers suggested that he could be implicated for Simpson's murder.   I accordingly cannot conclude that Warren had "*no* knowledge" of the evidence regarding Antonio's and Hunt's alleged coercion by police as reflected in their affidavits. (Hunt subsequently averred that he "lied because I was told that if I didn't say that Allen shot that man that I would be charged with the murder of the man," and Antonio subsequently averred that the "police told me if I didn't testify against Raymond, I could be charged with a crime.")

{¶ 65} Further, even if I were to conclude that Warren was unavoidably prevented from discovering the evidence, Warren did not file his motion for leave within a reasonable period of time under the circumstances.   Hunt's affidavit, which Warren attached to his pro se January 9, 2002 "Motion to Receive Copy of Trial Transcripts," is dated October

26, 1999. In his January 29, 2001 affidavit, Warren averred that he "is moving for a new trial having obtained newly discovered evidence." In his 2002 motion, Warren indicated that he is "presently preparing a motion for a new trial." While Warren cites the difficulty of preparing a motion for a new trial without a transcript, I note that in correspondence from Warren to Lane, attached to Lane's affidavit and dated March 19, 2004, Warren indicated that he "received the package you sent containing the transcripts of my case."

{¶ 66} Warren was advised by Fenlon in 2003 that the fact that Hunt's affidavit was three years old was problematic. While Warren relies on the multiple affidavits attached to his amended motion to explain why he did not file the motion before late 2013, he does not excuse the delay of many years even from 2008, when he had obtained both witnesses' recantations. Warren knew of one recantation since as early as 1999 and both as late as 2008. As this Court has noted, "[t]he trial court cannot extend the time to file a motion under Crim.R.33 other than pursuant to the conditions provided in that rule. See Crim.R. 45(B)." *McConnell*, 2011-Ohio-5555, ¶ 14.

{¶ 67} Regarding Warren's argument that newly discovered scientific evidence undermines the gun shot residue testing employed herein, I agree with the trial court that it "is clear from the trial transcript that Defendant's trial counsel was aware of concerns associated with AA testing in 1994 and attempted to undermine the credibility of the evidence presented at trial." I further agree that the "trial testimony also made clear that the elements sought in the AA testimony occurred in nature, and could have been present in the materials associated with Warren working on the minibike he was fixing at or near the time of Simpson's death."

{¶ 68} For example, Steven Tobias testified that he was an evidence technician

with the Dayton Police Department, and that he performed the AA testing on Warren's hands, and Gary Shaffer testified that he is employed as a forensic chemist at the Miami Valley Regional Crime Laboratory.   Shaffer testified as follows:

In this particular situation, as far as what is known as gunshot residue analysis, what it consists of is that when bullets or primers of bullets are manufactured, they, the manufacturing companies put different types of elements that are normally placed into the primers in order to make them explode and propel the bullet and so forth.   Two of those elements that are normally placed into the primers are what is known as antimony and barium, which are both metals in that they're normally not commonly encountered in the every day [sic] environment but they are in situations involving firearms.

When a firearm is discharged, these elements are expelled from the weapon, if you would, in a cloud or whatever, and if an individual's hands are in close proximity to this discharging weapon, or if a weapon is contaminated with this residue and he handles it, or if the individual is, say, down range from a weapon and his hands are in that area, these elements can be deposited on an individual's hands.

And what is done at a crime scene or some other opportune time is that hand swabbings are obtained, which basically consist of Q-tips are actually swabbed on an individual's hands.   Normally, they're swabbed on like the right palm, the right back, the left palm and the left back, each area having its own set of Q-tips, and these swabs are sent to the laboratory,

and what I do is to analyze these swabs to determine if they have any significant amounts of antimony and barium on them. If they do, I can then say within a reasonable scientific certainty these amounts of antimony and barium are consistent with those found in situations involving gunshot residue.

**{¶ 69}** Shaffer further testified as follows:

Antimony, both elements, antimony and barium, are trace elements, but antimony is normally the rarer of the two. In other words, it's less likely to find antimony than it would be barium in an every day [sic] situation. In order for me to say that something is consistent with gunshot residues, I need both antimony and barium present, so by running the antimony, which is generally the rarer of the two, if I find no antimony, at that point I can say, "Well, even if there is barium, there's no antimony, so I can't say that this is gunshot residue." So normally, I run the antimony first, and then if it has sufficient levels, I'll go ahead and run the barium to see if it's sufficient also. But if I do not find any antimony, normally, I don't test for barium.

**{¶ 70}** After describing the process he used to test the Q-tips, Shaffer testified as follows:

Well, both these elements, even though they are considered trace elements, they are naturally occurring in the environment. In other words, certain individuals, through their work or whatever, can accumulate quantities of antimony and barium on their hands. Normally, though, most people will, won't collect. If they have any at all, they might have some

antimony but they won't have barium, or they might have barium but they won't have antimony. So the reason I test for both is that it, more or less, since antimony and barium are known to be present in the cartridge case, I need to have both of them there to kind of ensure that these are at least consistent with gunshot residue.

{¶ 71} Shaffer testified that Warren's "swabs marked right palm were the only swabs that had both antimony and barium in sufficient quantities." According to Shaffer, the test "reveals that his hands, the amounts of antimony and barium are consistent with an individual who has had his hands in an environment of gunshot residue. In other words, his hand are [sic] consistent with coming in contact with gunshot residue. How that actual contact came about I can't say with any scientific certainty." Shaffer continued as follows:

Several possibilities are an individual could actually fire a weapon; he could handle a contaminated weapon; he could be, for example, a victim of a shooting where someone fires a weapon and residue gets on his hands that way. Those are basically the main three, or even, for example, he could possibly handle some kind of contaminated ammunition or something, but to pinpoint exactly saying, "Yes, this man fired a weapon," I can't say that with any scientific certainty.

{¶ 72} The following exchange occurred:

Q. Are you familiar with the term, as it relates to antimony and barium and gunshot residue, with the term transference?

A. Yes, sir.

Q. What is that, please?

A. Normally, the residues, say in an individual who fired a weapon and his hand would be, if you would, contaminated with gunshot residues, but residues normally don't stay on an individual's hand for a long period of time. Normally, an individual, as long as he doesn't wash his hands, the residues will essentially be transferred or wiped away in say four to six hours or something like that. These residues, when they are, for example, my hand was contaminated and I touch this area here, it's possible for someone to come by and also touch that area and maybe pick some up.

Q. What if an individual fired a gun and then later, I notice you do, you sort of rub your hand together once in a while, would that transfer from one location of the hand to the other location of the hand that's being rubbed together?

A. Yes.

{¶ 73} The following exchange occurred on cross-examination:

Q. * * * Although antimony is described by you as being rarer than barium, you do agree there are occasions for people during the day to run across either or both of those?

A. Yes, sir.

Q. They can run across either antimony or barium in a sufficient quantity to have an effect on that test?

A. Yes, sir.

Q. And is fireworks a source of antimony?

A. It is possible. I haven't done any studies of that.

Q. What about perhaps some pigments that be used in rubbers?

A. I'm not aware of any, but it's possible.

* * *

Q. As a source of barium, do you know in your training as a chemist whether or not lubricating oils and grease contain barium?

A. Some of them do, yes, sir.

Q. What about the type of rubber compounds that would be used in tires?

A. I'm not sure.

{¶ 74} I further note the following exchange in the course of the cross-examination of Hunt:

Q. * * * The car crashed in the early morning hours of July 10th. I'm talking to you about the evening before and the afternoon before that. That would be July 9th. * * * You had occasion to spend time with Raymond and Antonio that day, didn't you?

A. Yes.

Q. And at least some of the time that you were together with them involved the mopeds, correct, and the scooters?

A. Right.

Q. And the activities that day included both you and Antonio and Raymond working on those scooters, correct?

A. Yeah.

Q. And work included work with the tires, right?

A. Right.

Q. And also putting oil and grease into the scooters?

A. Yeah.

Q. And putting of the oil and gas into the scooters was something that you did, right?

A. Yes.

Q. And something that you saw Raymond do, didn't you?

A. Um hmmm.

* * *

Q. That was something that went on during the day, correct?

A. Correct.

Q. Because you all were fixing on [sic] the bikes and then driving around through the neighborhood?

A. Right.

Q. That continued on even through into the evening?

A. Right.

{¶ 75} The above record reflects that defense counsel thoroughly cross-examined Shaffer about potential alternative sources for any positive results for gunshot residue, and Shaffer testified that he "can't say * * * with any scientific certainty" that Warren fired a weapon. Shaffer further indicated that antimony and barium "are naturally occurring in the environment. In other words, certain individuals, through their work or whatever, can accumulate quantities of antimony and barium on their hands." Shaffer

indicated that the trace elements can further be transferred from one location to another. He further indicated that some lubricating oils and grease contain barium, and that fireworks may contain antimony. The record accordingly reflects that Shaffer did not persist in any conclusion that Warren fired a weapon on the night of the shooting, and defense counsel further adduced evidence in the course of Hunt's cross-examination that Warren was exposed to other potential sources of the trace elements before the shooting while working on the scooter, namely tires, grease and oil.   Finally, I note that the article submitted by Warren does not set forth definitive guidelines for GSR testing.   I conclude that Warren's arguments regarding newly discovered evidence of gunshot residue testing fail.

{¶ 76} Based upon the foregoing, I conclude that an abuse of discretion is not demonstrated.   As noted above, even if I were to conclude that Warren had no knowledge of and was unavoidably prevented from discovering the evidence upon which he relies, he has not adequately explained the undue delay in filing his motion. Accordingly, I would overrule his first assigned error.   Finally, since the documents attached to his motion do not on their face support a conclusion that he was unavoidably prevented from discovering the evidence within the time provided by statute, he is not entitled to a hearing on the motion, and I would therefore overrule his second assignment of error.   I would affirm the judgment of the trial court.

{¶ 77} I very respectfully dissent.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Joanna Feigenbaum

Hon. Mary Katherine Huffman